**NOT FOR PUBLICATION**

## UNITED STATES BANKRUPTCY APPELLATE PANEL

### OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: ) | BAP No. SC-14-1287-JuKlPa |
| ) | BAP No. SC-14-1320-JuKlPa |
| UC LOFTS ON 4TH, LLC; UC LOFTS) | (related appeals) |
| ON 5TH, LLC; ) | |
| ) | Bk. No. 05-15409-CL7 |
| Debtors. ) | |
| _____) | Adv. No. 07-90139-CL |
| LESLIE T. GLADSTONE, Chapter 7) | |
| Trustee, ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | **M E M O R A N D U M**[*] |
| ) | |
| FRANK SCHAEFER; FRANK SCHAEFER) | |
| CONSTRUCTION CO.; FRANK ) | |
| SCHAEFER CONSTRUCTION, INC. ) | |
| PENSION PLAN; SHEILA LEMIRE, ) | |
| ) | |
| Appellees. ) | |
| _____) | |
| HALIFAX INVESTMENTS, LLC; ) | |
| JOHN SCAFANI, ) | |
| ) | |
| Appellants, ) | |
| ) | |
| v. ) | |
| ) | |
| LESLIE T. GLADSTONE, Chapter 7) | |
| Trustee, ) | |
| ) | |
| Appellee.[**] ) | |
| _____) | |

Argued and Submitted on July 23, 2015
at Pasadena, California

---

[*] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8024-1.

[**] **NOTE TO CLERK:** please change the caption to reflect the above.

-1-

Filed - September 4, 2015

Appeal from the United States Bankruptcy Court
for the Southern District of California

Honorable Christopher B. Latham, Bankruptcy Judge, Presiding
_____

Appearances:    Jeffry A. Davis of Mintz Levin Cohn Ferris
                Glovsky & Popeo argued for appellant/appellee
                Leslie T. Gladstone, Chapter 7 Trustee; Gregg A.
                Johnson argued for appellant Halifax Investments,
                LLC and appellant John Scafani; James Jay Stoffel
                of Beberman Stoffel & Beberman argued for
                appellees Frank Schaefer, Frank Schaefer
                Construction Co., and Frank Schaefer
                Construction, Inc. Pension Plan.[***]
_____

Before:   JURY, Klein,[****] and PAPPAS, Bankruptcy Judges.

Chapter 7[1] trustee, Leslie A. Gladstone (Trustee), filed an adversary proceeding against Frank Schaefer, Frank Schaefer Construction, Inc., Frank Schaefer Construction, Inc. Pension Plan (collectively, the Schaefer Entities), John Scafani, Sheila Lemire, Halifax Investments, LLC, and others,[2] seeking to avoid

---

[***] Appellee Sheila Lemire has not participated in this appeal.

[****] Hon. Christopher M. Klein, Chief United States Bankruptcy Judge for the Eastern District of California, sitting by designation.

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532. "Rule" references are to the Federal Rules of Bankruptcy Procedure and "Civil Rule" references are to the Federal Rules of Civil Procedure.

[2] Trustee named others as defendants in the adversary proceeding including Charles McHaffie who is mentioned below.  On March 23, 2011, the bankruptcy court approved Trustee's settlement with James Warner and the Law Offices of James Warner, and with Broadsmore Capital, LLC, Centaur Construction, Matthew
(continued...)

-2-

several transfers arising out of a series of loan transactions to finance the acquisition and initial development of real property held by debtors, UC Lofts on 4th, LLC and UC Lofts on 5th, LLC (Debtors or UC Lofts). Trustee also asserted claims against the Schaefer Entities seeking to avoid preferential transfers and equitable subordination of the proof of claim filed by Frank Schaefer Construction, Inc. (Schaefer Construction).

The bankruptcy court bifurcated the issues for trial into (1) insolvency; and (2) all others. The court held a trial in February 2012 on insolvency and issued a memorandum decision finding that Trustee failed to prove debtors were insolvent on February 12, 2004.[3] The bankruptcy court later conducted an eight day bench trial in which it considered the issue of Debtors' insolvency at the time of the various transfers and all remaining issues.

After trial, the court issued its findings of fact and conclusions of law in a single judgment. The bankruptcy court granted judgment in favor of the Schaefer Entities, Scafani, and Lemire on the ground that Trustee had failed to meet her burden of proof on all claims against them. As to Halifax, the bankruptcy court awarded judgment in Trustee's favor on the

---

[2](...continued)
Gordon and Peter Kostopoulous. On October 24, 2011, the bankruptcy court approved Trustee's settlement with McHaffie which included a stipulated judgment in the sum of $375,000. Other defendants were dismissed.

[3] This decision was issued by Judge Meyers who has since retired from the bench.

-3-

fraudulent transfer claim in the amount of $1,100,000 plus $537,734.25 in prejudgment interest.

Trustee appeals from the bankruptcy court's ruling in favor of the Schaefer Entities, Scafani, and Lemire, contending that the court erred in numerous ways relating to her various claims (BAP No. 14-1287). Halifax appeals from the judgment against it on the fraudulent transfer claim (BAP No. 14-1320). For the reasons set forth below, we AFFIRM the judgment in all respects.

## I.  FACTS[4]

**A.   Charles McHaffie's Purchase of Urban Coast**

Urban Coast, LLC ("Urban Coast") was the sole owner and managing member of Debtors. The sole asset of each debtor was contiguous real property near downtown San Diego, California (Lofts Property), which was to be developed for mixed use and known as the Atmosphere Project. McHaffie acquired 100% of the membership interests of Urban Coast in two contemporaneous transactions.

He purchased forty-nine percent of Urban Coast from Halifax for $1,600,000 which was evidenced by a sale agreement (Halifax Sale Agreement) and a promissory note secured by a deed of trust on the Lofts Property. The Halifax Sale Agreement listed McHaffie as the "Buyer," Scafani as the "Broker," Urban Coast as the "Company" and Halifax as the "Seller." The terms of the sale agreement required McHaffie and Urban Coast to execute the promissory note. McHaffie executed the promissory note on

---

[4] We borrow heavily from the facts set forth in the bankruptcy court's memorandum decision entered March 27, 2014.

-4-

behalf of Urban Coast but did not sign in his individual capacity. Although McHaffie pledged the Lofts Property as collateral for the note, the UC Lofts entities were not parties to the Halifax Sale Agreement. Halifax and Scafani promised to refrain from recording the deed of trust until Urban Coast obtained construction financing. McHaffie signed the deed of trust against the Lofts Property but never delivered it to Halifax, so it remained unrecorded.

Scafani, a licensed real estate broker, wholly owned and managed Halifax. Under the terms of the sale agreement, Scafani was to receive real estate brokerage representation rights in connection with offering the finished condominium units for sale and preferential rights in purchasing condominium units in the Atmosphere Project.

A consortium known as the Broadsmore Group owned the majority fifty-one percent interest in Urban Coast. McHaffie paid $2,452,803 for the Broadsmore Group's interests: $1,899,625 in cash and $552,803 in a promissory note secured by a deed of trust on real property held by La Bella Vida, L.P.

To fund the purchase of Urban Coast, McHaffie caused Debtors to obtain a $4,000,000 loan from the Barth Family (Barth Loan) which was evidenced by a promissory note and secured by a first priority trust deed on the Lofts Property. Debtors also obtained a loan from the Frank Schaefer Construction Inc. Pension Plan (Schaefer Pension) in the amount of $1,750,000 which was evidenced by a promissory note and secured by a junior trust deed on the Lofts Property (Schaefer Initial Loan).

McHaffie applied $4,527,600 from the Barth and Schaefer

-5-

Loans to purchase Urban Coast and pay various loan fees, appraisal fees, commission, taxes and other expenses. He deposited $1,222,400 into a fund control account (First Fund Control) controlled by the Schaefer Pension. Around the same time, the parties entered into an agreement to govern disbursements out of the fund control account (Fund Control Agreement). Under the agreement, funds would be disbursed to McHaffie upon written order for payment of items relating to the development of the Lofts Property. The $1,222,400 amount was based on a proposed budget for the project which consisted of various line item costs related to, among other things, shoring and concrete, excavation, equipment rental, and the like.

When McHaffie acquired Urban Coast there were two deeds of trust against the Lofts Property which were unrecorded. One deed of trust allegedly secured a $3,400,000 obligation to Urban Coast (UC DOT) and the other allegedly secured a $100,000 obligation to SD Lofts, LLC (SD Lofts DOT).[5] Those debts were not paid off with the Barth and Schaefer Loans.

McHaffie's transactions for the purchase of Urban Coast closed on February 12, 2004. At that time, Debtors' total assets were the Lofts Property and $1,224,900 held in the First Fund Control account.

Between February 12, 2004 and April 2, 2004, Debtors made numerous transfers from the First Fund Control: $20,000 on February 23, 2004 to the Schaefer Pension Plan for

---

[5] As further discussed below, whether or not these deeds of trust secured valid and enforceable obligations of Debtors was a contested issue at trial relating to the issue of insolvency.

"Reimbursement-Management;" $5,000 on March 5, 2004 to James Warner, Esq. for "Legal;" $20,000 on March 5, 2004 to Charlemagne McHaffie[6] for "Funds to Borrower;" $50,000 on March 8, 2004 to Ron Bedell for "Commission;" and $20,000 on April 1, 2004 to Charlemagne McHaffie with no stated purpose.

**B.    The Schaefer Construction April 2, 2004 loan for $1,200,000**

On April 2, 2004, Debtors borrowed $1,200,000 from Schaefer Construction (April 2, 2004 Loan) which was evidenced by a straight note and secured by a third position deed of trust on the Lofts Property.  The UC and SD Lofts DOTs were subordinated to the April 2, 2004 Loan.

McHaffie used the April 2, 2004 Loan proceeds to exercise an option to purchase a Nevada limited liability company, Tropicana Partners, LLC (Tropicana).  Tropicana's primary asset was commercial real property in Las Vegas, Nevada.  Debtors made the following additional payments to acquire Tropicana: $100,000 on May 20, 2004 to Santoro, Driggs for legal fees; $1,000 on May 24, 2004 to Lawyer's Title for title fees; $50,000 on May 26, 2004 to Fred Young for "Deposit, per borrower;" $5,010 on June 17, 2004 to Santoro, Driggs for legal fees; $10,000 on July 21, 2004 to Santoro, Driggs for legal fees; $300,000 on July 21, 2004 to Joy Turner for "Deposit, per borrower;" and $60,000 on July 21, 2004 to Santoro, Driggs for legal fees.

During this time period, Debtors also made the following transfers from the First Fund Control that were unrelated to the

---

[6] Charlemagne was evidently Charles' son.

-7-

Tropicana acquisition or the Atmosphere Project: $10,000 on May 14, 2004 to James Warner for legal fees; $46,666.67 on July 8, 2004 to Pacific Horizon Financial for "Interest payment, 1st TD;" and $20,416.67 on July 8, 2004 to Action Loan Servicing for "Interest payment; 2nd TD." The last two transfers went to pay down interest on McHaffie's personal residence.

On August 17, 2004, Debtors made a $36,000 interest payment toward the April 2, 2004 Loan.

On August 20, 2004, Schaefer Construction initiated a nonjudicial foreclosure on the Lofts Property by recording a notice of default and sale. The notice of sale was subsequently rescinded in January 2005.

**C.    The Schaefer Entities September 24, 2004 loan for $2,500,000**

On September 24, 2004, the Schaefer Entities loaned Debtors another $2,500,000 (Second Loan). The Second Loan was secured by an assignment of the $3,400,000 UC DOT which was property of Urban Coast, not Debtors. Frank Schaefer later testified that there was no note in connection with the UC DOT: "[i]t was a bogus deal. That note actually didn't exist. The deed of trust did, but there was no note. So there was nothing owing on it. So I took something of no value."

The Schaefer Entities initially funded the Second Loan with $500,000 and charged $35,312 as a loan origination fee. Debtors directed $100,000 of the Second Loan proceeds to pay Hawkins & Hawkins Architects, Inc. to maintain the necessary building permits on the Lofts Property and deposited the remaining $365,688 into a second fund control account (Second

-8-

Fund Control).

After receiving the Second Loan proceeds, Debtors made the following transfers from the First Fund Control: $37,000 on October 8, 2004 to Charlemagne Ed. Trust for "Funds to Borrower;" $35,000 on October 8, 2004 to WH-TH for "Funds to Borrower;" $10,000 on October 8, 2004 to Charlemagne McHaffie Trust for "Funds to Borrower;" and $4,097.83 on October 15, 2004 to the City of San Diego to fund a bond. After these transfers, the First Fund Control was overdrawn by $2,179.50.

**D.    The Schaefer Entities November 19, 2004 loan for $4,000,000 and Halifax Settlement for $1,100,000**

Scafani discovered that the Schaefer Entities trust deed in relation to the April 2, 2004 Loan had been recorded on April 10, 2004, making it senior to Halifax's yet-to-be delivered and recorded deed of trust. Because this was contrary to the terms of the parties' agreement, on June 25, 2004, Halifax and Scafani filed a lawsuit against McHaffie and Urban Coast for breach of contract and fraud seeking rescission of the Halifax Sale Agreement. Halifax did not name Debtors as defendants. Halifax and Scafani also recorded a lis pendens against the Lofts Property in connection with the state court lawsuit.

On November 18, 2004, McHaffie, Halifax, Scafani, Urban Coast, the Schaefer Entities, and others entered into a settlement agreement and mutual release (Halifax Settlement Agreement). According to the settlement, Halifax and Scafani agreed to dismiss the lawsuit against McHaffie and Urban Coast and withdraw the lis pendens against Debtors. In exchange, they

-9-

would receive payment of $1,100,000 million which reflected a $500,000 discount on the promissory note executed by McHaffie on behalf of Urban Coast.

By mid-November 2004, the First Fund Control displayed a negative balance, the Schaefer Entities had filed a notice of default related to the April 2, 2004 Loan, and Debtors had no other sources of capital. At the time, Schaefer and McHaffie were negotiating the transfer of the Tropicana property to satisfy the April 2, 2004 Loan and they also discussed a possible new loan. Eventually, McHaffie agreed to assign the interest in the Tropicana property to Schaefer Construction in full payment and cancellation of the April 2, 2004 note executed in the sum of $1,200,000.

These events converged to precipitate an immediate need for capital. On November 19, 2004, Schaefer Construction loaned Debtors an additional $4,000,000 (Third Loan), which was evidenced by a promissory note and secured by the Lofts Property. This loan was arranged by a licensed real estate broker, Edward Spooner of Lending Associates, and funded in the initial amount of $1,165,000. The escrow instructions routed $1,100,000 of the loan proceeds directly to Halifax, charged a $210,500 loan origination fee and charged $52,500 as an extension fee for the Schaefer Initial Loan. Scafani testified at trial that Halifax disbursed the $1,100,000 to its creditors. The withdrawal of the lis pendens was also part of the escrow agreement. When the funds were distributed by escrow, the Notice of Withdrawal of the Notice of Pendency Of Action was recorded.

The Third Loan also extinguished the Second Loan. Debtors transferred $206,552.65 from the Second Fund Control and $299,447.35 from the Third Loan proceeds to pay off the $500,000 funded under the Second Loan. This transfer left the Second Fund Control with a zero balance. Schaefer Construction advanced another $111,600 under the Third Loan on November 22, 2004 to replenish the deficiency. This left a $6,413.69 balance in the Second Fund Control. After the Third Loan, the Schaefer Entities made no new loans to Debtors.

On December 30, 2004, at McHaffie's request, Schaefer Construction assigned the April 2004 note and deed of trust to Lemire.[7] On April 18, 2005, Lemire executed and recorded a Substitution of Trustee and Full Reconveyance of the April 2, 2004 deed of trust.

**E.    The April 2005 global settlement**

In April 2005, Debtors and Schaefer Construction entered into a workout agreement whereby Schaefer Construction agreed to provide $1,130,000 in additional funding under the terms of the Third Loan. The agreement reinstated and extended the Third Loan's maturity date and paid delinquent real property taxes. Under the agreement, Debtors were also required to reconvey all deeds of trust junior to the Third Loan, which included the deeds of trust securing the $3,400,000 debt owed to Urban Coast, the $100,000 debt owed to SD Lofts, and the April 2, 2004 Loan deed of trust that Schaefer had assigned to Lemire. The only

---

[7] Trustee argues that this assignment of the deed of trust made Lemire a subsequent transferee liable for $1,200,000 arising out of the April 2, 2004 Loan.

-11-

advances that the Schaefer Entities made after April 15, 2004 under the Third Loan went to pay off the $1,750,000 Schaefer Initial Loan.

**F.    The sale of Tropicana by Lemire**

In September of 2005, Lemire paid Schaefer Construction $70,000 for a lease option to purchase the Tropicana property. In April 2006, after substantial work in repairing and releasing the individual units, Lemire was able to generate approximately $200,000 to $500,000 in net income on the sale of the Tropicana property.

**G.    Involuntary Chapter 11**

On October 25, 2005, three unsecured creditors of Debtors filed involuntary chapter 11 petitions against them.  Debtors initially contested the petition.  In January 2006, they withdrew their answers to the involuntary petitions and an order for relief was entered.

On April 17, 2006, Gladstone was appointed the chapter 11 trustee for both debtors.  The bankruptcy court later entered an order directing the joint administration of the related chapter 11 cases.

In early September 2006, the bankruptcy court entered an order terminating the automatic stay in favor of Schaefer Construction.  Schaefer Construction foreclosed on the Lofts Property and became the owner.  Schaefer then sold the Lofts Property through an LLC to Alpha and Omega Development, LLC for $6,000,000 and paid $5,312,330.37 out of escrow to First National Bank, the successor beneficiary to the Barth note.  The Schaefer Pension Plan also made an additional $1,250,000 hard

-12-

money loan to Alpha and Omega Development, LLC secured behind a purchase money loan from Dunham & Associates of $3,700,000 secured by a first deed of trust. Ultimately, the holder of the first trust deed foreclosed out the Schaefer Entities' interest in the Lofts Property.

Schaefer Construction filed a secured proof of claim in Debtors' case alleging that the amount it was owed on account of the Third Loan was $5,678,351.50.

On October 20, 2006, Debtors' cases were converted to chapter 7 and Gladstone was appointed the chapter 7 trustee.

**H.    The Adversary Proceeding**

On April 2, 2007, Trustee filed the adversary complaint which is the subject of this appeal. Trustee asserted claims against the Schaefer Entities for: (1) avoidance and recovery of fraudulent transfers; (2) avoidance and recovery of preferential transfers; (3) aiding and abetting breach of fiduciary duty; (4) declaratory relief that Frank Schaefer was a partner of Debtors; (5) equitable subordination of Schaefer Construction's claims; (6) breach of fiduciary duty to Debtors; and (7) conversion.[8]  Trustee also sought to avoid allegedly fraudulent transfers to, or for the benefit of, defendants

---

[8] The Schaefer Entities filed a motion for summary judgment which was granted in part and denied in part. The bankruptcy court granted summary judgment in their favor as to Trustee's eleventh and thirteenth claims for relief on usury relating to the first loan, first loan extensions and the third November 2004 loan of $4,000,000. Trustee withdrew the twelfth claim for usury in connection with the September 24, 2004 loan for $2,500,000 which was funded in the amount of $500,000. Trustee also withdrew her tenth claim for relief for alter ego prior to the hearing on the motion for summary judgment.

-13-

Lemire, Scafani and Halifax.

The adversary proceeding was assigned to Judge James M. Meyers. Judge Meyers bifurcated the trial, with the initial session on whether Debtors were insolvent as of February 12, 2004 (the date McHaffie acquired 100% membership interest in Urban Coast). At the trial on insolvency, Judge Meyers concluded that the value of Debtors' assets on that date was "in the range of $8 million to $9.5 million," and the liabilities were $6,154,531. The bankruptcy court did not explain how it reached its decision. In an April 17, 2012 status report, Trustee requested the court to issue a supplemental decision with specific findings regarding the value. No supplemental decision was issued. Judge Meyers retired and the case was reassigned to Judge Christopher Latham.

Following an eight day trial, the bankruptcy court issued its memorandum decision on March 27, 2014. The court found that the value of the Lofts Property was $7,366,306 as of April 2004, and $8,225,954 as of November 24, 2004. The court also found that the Schaefer Entities were not insiders of the Debtors. In ruling on the fraudulent transfer claims, the court found that: (1) after the April 2, 2004 Loan, Debtors' liabilities were $7,118,385.52 and, therefore, Debtors' assets[9] exceeded their debts by $1,205,920.48; (2) the Third Loan and the $1,100,000 payment to Halifax ultimately rendered Debtors insolvent because by November 22, 2004, Debtors' liabilities greatly exceeded

_____

[9] Debtors' assets also included monies in the First Control Fund.

-14-

their assets and they were balance sheet insolvent by at least $964,797.33; (3) the Third Loan and the $1,100,000 payment to Halifax left Debtors with unreasonably small assets; (4) transfers related to Tropicana and the April 2, 2004 Loan were not fraudulent as to the Schaefer Entities; (5) transfers related to the Second and Third Loans and Halifax payment were not fraudulent as to the Schaefer Entities; (6) Trustee failed to meet her burden that Lemire was a subsequent transferee of the Tropicana property or that she did not provide reasonably equivalent value; (7) the payment to Halifax was constructively fraudulent and should be avoided; and (8) neither Scafani nor Halifax provided reasonably equivalent value for the $1,100,000 transfer.

Trustee had also sought to avoid as preferential transfers two payments totaling $506,000 made by Debtors to the Schaefer Entities. The bankruptcy court found the Schaefer Entities were not insiders and thus the extended preference period did not apply. Therefore, the transfers were not recoverable as preferences.

Finally, on the equitable subordination claim, the bankruptcy court found Trustee had not met her burden to equitably subordinate Schaefer Construction's proof of claim. Since the court found that none of the Schaefer Entities were insiders or partners of Debtors, the burden remained with Trustee to prove circumstances justifying subordination. In the end, the court found that the evidence did not establish inequitable conduct.

The bankruptcy court entered judgment on the adversary

complaint on the same date it issued its memorandum decision, awarding judgment as to all claims in favor of the Schaefer Entities, Scafani, and Lemire and awarding judgment against Halifax in the amount of $1,100,000, plus interest.

Trustee filed a motion to amend the judgment on April 10, 2014. The Schaefer defendants filed a response.

On June 6, 2014, the bankruptcy court issued an order on Trustee's motion resulting in a two page revision of the memorandum decision with no change in the judgment. On the same day, Trustee filed her notice of appeal.[10] On June 20, 2014, Halifax filed its related appeal.

## II. JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A) and (H). We have jurisdiction under 28 U.S.C. § 158.

## III. ISSUES

**FRAUDULENT TRANSFER CLAIMS: SCHAEFER ENTITIES AND LEMIRE**

1. Did the bankruptcy court err by considering parol evidence to explain or construe the payment provision in the November 2004 Halifax Settlement Agreement which stated that Frank Schaefer Construction "shall pay" to Halifax the sum of $1,100,000?

2. Did the bankruptcy court err by not including the $3,400,000 Urban Coast obligation and $100,000 SD Lofts obligation in its insolvency analysis as of April 2, 2004 when

---

[10] Trustee subsequently filed two amended notices of appeal with no substantive changes.

those obligations were "stipulated facts" in the pretrial order?

3.  Did the bankruptcy court err by determining that Schaefer Construction gave reasonably equivalent consideration for the April 2, 2004 Loan?

4.  Did the bankruptcy court err by failing to place the burden of proof on Sheila Lemire to establish her good faith defense as a subsequent transferee?

**FRAUDULENT TRANSFER CLAIM: HALIFAX**

1.  Did the bankruptcy court err by determining that the $1,100,000 payment from Debtors to Halifax was a fraudulent transfer because Halifax was not a secured creditor based on the filing of the lis pendens?

2.  Did the bankruptcy court err in determining that Halifax did not give reasonably equivalent value for the $1,100,000 payment by releasing its $1,600,000 note, dismissing its lawsuit, and withdrawing the lis pendens against the Lofts Property?

3.  Did the bankruptcy court err in determining that Scafani was not liable for receiving a fraudulent transfer because the entire $1,100,000 transfer went to Halifax's creditors and Scafani did not receive any of the funds?

**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY: SCHAEFER ENTITIES**

Did the bankruptcy court err by finding that the Schaefer Entities did not have actual knowledge of McHaffie's defalcations as they occurred for purposes of aiding and abetting McHaffie's breach of fiduciary duty under California law?

**PREFERENTIAL TRANSFER CLAIM: SCHAEFER CONSTRUCTION**

Did the bankruptcy court err by determining that the Schaefer Entities were not "insiders" within the meaning of §§ 101(1) and 547?

**EQUITABLE SUBORDINATION: SCHAEFER CONSTRUCTION**

Did the bankruptcy court err by determining that the Schaefer Entities had not engaged in inequitable conduct?

## IV.   STANDARDS OF REVIEW

We review findings of fact for clear error and conclusions of law and mixed questions of law and fact de novo. Banks v. Gill Distrib. Ctrs., Inc., 263 F.3d 862, 867 (9th Cir. 2001).

A bankruptcy court's factual determination is clearly erroneous if it is illogical, implausible, or without support in the record. United States v. Hinkson, 585 F.3d 1247, 1261-62 & n.21 (9th Cir. 2009) (en banc) (quoting Anderson v. City of Bessemer City, N.A., 470 U.S. 564, 577 (1985)) (explaining that the clearly erroneous standard of review is an element of the clarified abuse of discretion standard).  Where there is admitted evidence in the record to support the bankruptcy court's fact findings, an appellate court cannot substitute its views of the facts for those of the bankruptcy court. Anderson, 470 U.S. at 573.  "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Id. at 574.

The determination of insider status is a question of fact to be reviewed under the clearly erroneous standard. Friedman v. Sheila Plotsky Brokers, Inc. (In re Friedman), 126 B.R. 63, 67 (9th Cir. BAP 1991).

-18-

The bankruptcy court's decision regarding equitable subordination is reviewed for abuse of discretion. <u>Paulman v. Gateway Venture Partners III (In re Filtercorp, Inc.)</u>, 163 F.3d 570, 587 (9th Cir. 1998). A court abuses its discretion when it fails to identify and apply "the correct legal rule to the relief requested," or if its application of the correct legal standard was "(1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.'" <u>Hinkson</u>, 585 F.3d at 1262-63.

We may affirm the bankruptcy court's decision on any ground supported by the record. <u>Olsen v. Zerbetz (In re Olsen)</u>, 36 F.3d 71, 73 (9th Cir. 1994).

## V. DISCUSSION

### A. Fraudulent Transfers: Schaefer Entities and Lemire

Section 544(b)(1) provides that a trustee "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim . . . ." Trustee, acting in her capacity as an unsecured creditor, seeks to avoid certain transfers to the Schaefer Entities and Lemire under California's Uniform Fraudulent Transfer Act (UFTA). <u>See</u> Cal. Civ. Code § 3439 et. seq.; <u>see also</u> <u>Gen. Elec. Capital Auto Lease, Inc. v. Broach (In re Lucas Dallas, Inc.)</u>, 185 B.R. 801 (9th Cir. BAP 1995) (noting that the California UFTA "only confers standing upon a 'creditor' of the debtor" <u>citing</u> Cal. Civ. Code § 3439.07(a)).

Under California's UFTA, a transfer is constructively fraudulent if the debtor made the transfer without receiving

-19-

reasonably equivalent value in exchange and the debtor either: (1) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (2) intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due; or (3) was insolvent at the time, or was rendered insolvent by the transfer or obligation. Cal. Civ. Code §§ 3439.04(a), 3439.05.

**1. The bankruptcy court did not err by considering parol evidence to construe the payment provision contained in the November 2004 Halifax Settlement Agreement.**

The Halifax Settlement Agreement provides in relevant part:

SETTLEMENT TERMS: CASH. In full and final settlement of all claims, whether or not said claims have been set forth in the LITIGATION, SCHAFFER [sic] [Construction] shall pay to HALIFAX, in cash, the sum of One Million One Hundred Thousand Dollars ($1,100,000).

"Schaefer" is defined in the settlement as "Frank Schaefer Construction, Inc." and the agreement contained an integration clause.

Trustee contends on appeal, as she did at trial, that Schaefer Construction did not pay the $1,100,000 as required under the settlement agreement, instead requiring Debtors to use proceeds from the Third Loan to pay Schaefer Construction's obligation. According to Trustee, because Debtors were insolvent on the date of the transfer, the payment of $1,100,000 by Debtors to Halifax to satisfy the debt of Schaefer Construction was fraudulent. In addressing these arguments, the bankruptcy court found:

-20-

> The Trustee contends that this provision shifts the obligations owed by Urban Coast and McHaffie under the Halifax Sale Agreement onto Schaefer. The court disagrees. None of the Schaefer Entities was a party to either the Halifax Sale Agreement or the lawsuit filed by Scafani and Halifax. Rather than imposing a legal obligation on the Schaefer Entities, the court interprets this provision—which, like the rest of the document, was quite loosely drafted—as merely recognizing the source of payment.

Trustee contends that the court's ruling was erroneous because an unambiguous contract is interpreted as a matter of law without the use of parol evidence. Trustee argues that the payment provision here was unambiguous and susceptible to only one interpretation — Schaefer Construction was the party obligated to pay the $1,100,000 — "pay means pay." In finding otherwise, the court had inappropriately relied on evidence not on the face of the agreement.

The parol evidence rule has no applicability in this case for two reasons. First, Trustee stepped into the shoes of an unsecured creditor of the estate by invoking § 544(b). The parol evidence rule does not apply to disputes with third parties.

> In an action between a party to a contract and a third party the rule that parol evidence cannot be received to contradict or vary a written contract does not apply, as the estoppel on which the rule rests must be mutual, and, since the third person is not bound by the contract as written, neither is his adversary in the action.

Penberthy v. Vahl, 101 Cal.App.2d 1, 4 (1950); see also Alberts v. HCA Inc. (In re Greater Se. Cmty. Hosp. Corp. I), 365 B.R. 315, 318-19 (Bankr. D.D.C. 2007) (noting that a creditor would be "a third person, not a party to, nor representing a party to, the act."). Second, regardless of whether this rule applies in

this case, "the 'very essence' of a fraudulent transfer suit is to identify the 'true nature' of a transaction, and 'the parol evidence rule can[not] function as a false prophet to preclude consideration of evidence of the true nature of the transaction in question." In re Greater Se. Cmty. Hosp. Corp. I, 365 B.R. at 318 (citing Gaudet v. Babin (In re Zedda), 103 F.3d 1195, 1206 (5th Cir. 1997) (holding that trustee could not use parol evidence to exclude evidence in fraudulent conveyance suit brought under § 548)). Accordingly, this assignment of error is not grounds for reversal.

**2. The bankruptcy court did not err by determining that Debtors' assets exceeded their liabilities as of April 2, 2004.**

Under Cal. Civ. Code § 3439.02(a), "[a] debtor is insolvent if, at fair valuations, the sum of the debtor's debts is greater than all of the debtor's assets." For purposes of the fraudulent transfer claims, the bankruptcy court examined Debtors' financial condition from February 13, 2004 to November 24, 2004 (Relevant Period).[11] Regarding Debtors' liabilities, the bankruptcy court found:

> Defendant Scafani testified credibly that no accompanying note existed to support the UC DOT. Nor did Plaintiff provide any evidence of a signed note. Further, McHaffie signed for SD Lofts, LLC in all relevant transactions. Ultimately, both the SD Lofts DOT and the UC DOT were reconveyed. Neither SD Lofts, LLC nor Urban Coast ever demanded payment on these purported obligations during the relevant period between February 13, 2004 and November 24, 2004. The court therefore finds that the UC DOT and SD Lofts DOT were not liabilities owed by Debtors. Nevertheless,

---

[11] This period starts the day after McHaffie's purchase of 100% of Urban Coast closed and ends on the date the Schaefer Entities made their last loan to Debtors.

to facilitate the First Loan transaction, Urban Coast and SD Lofts, LLC agreed to subordinate their respective trust deeds.

Accordingly, the bankruptcy court did not include the UC or SD Lofts debts when calculating Debtors' liabilities at the time of the April 2, 2004 Loan and found Debtors were solvent.

Trustee argues on appeal that the bankruptcy court's decision to exclude these debts from its solvency calculation was based on her not producing any signed notes. Trustee asserts that she did not need to produce the notes because the pretrial order contained stipulated facts which conclusively established the existence of both a loan and note in favor of Urban Coast in the amount of $3,400,000 and a loan and note in favor of SD Lofts in the amount of $100,000. Therefore, according to Trustee, the bankruptcy court was required as a matter of law to consider these obligations in its insolvency analysis. Finally, Trustee maintains there was a "mountain of evidence" establishing these debts.

The undisputed facts in the pretrial order relied upon by Trustee are:

(10) On February 11, 2004, SD Lofts, LLC executed a Subordination Agreement, subordinating a note in its favor in the sum of $100,000 dated October 16, 2003, in favor of Urban Coast and secured by the UC Lofts Real Property to the Barth Note.

(11) On February 11, 2004, Urban Coast executed a subordination agreement, subordinating a note held by it and secured by the UC Lofts Real Property in the amount of $3,400,000 dated August 1, 2003 to a $4,000,000 [sic] by the Barths.

(12) On April 2, 2004, Schaefer Construction extended UC Lofts a loan in the amount of $1,200,000, secured by a junior deed of trust on the UC Lofts Real Property . . . .

-23-

. . . .

(14) On April 13, 2004, Urban Coast executed a Subordination Agreement, subordinating a loan in the amount of $3,400,000 dated August 1, 2003, in favor of Urban Coast and secured by UC Lofts Real Property, to the April 2, 2004 Note in favor of Schaefer Construction.

(15) On April 13, 2004, SD Lofts executed a Subordination Agreement, subordinating a loan in the sum of $100,000 dated as of October 16, 2003, in favor of Urban Coast and secured by UC Lofts Real Property to the April 2, 2004 Note in favor of Schaefer Construction.

Generally, "parties are bound by stipulated facts in a pretrial order." E.H. Boly & Son, Inc. v. Schneider, 525 F.2d 20, 23 n.5 (9th Cir. 1975) (citing Civil Rule 16). But here the language used in the stipulated facts does not clearly show that the parties agreed that there were underlying and enforceable debts owed by Debtors to Urban Coast and SD Lofts. Rather, under a plain language interpretation these stipulated facts at most show that the parties acknowledged the four recorded subordination agreements. Indeed, the pretrial order preserved the issue of Debtors' insolvency, and facts and evidence supporting the parties' positions were before the bankruptcy court. Trustee had an opportunity to rebut the evidence which refuted the existence of the UC and SD Lofts obligations. Moreover, she did not refer us to any portion of the record where she objected to the court's consideration of this evidence, asserting it was not relevant because the debt was "admitted" in the pretrial order. Accordingly, nothing in the record shows Trustee was relying on the pretrial order to establish the existence of these obligations.

The record shows that Scafani testified that the

-24-

transaction that would have resulted in the $3,400,000 obligation was never consummated and the bankruptcy court found his testimony credible. "When factual findings are based on determinations regarding the credibility of witnesses, we give great deference to the bankruptcy court's findings, because the bankruptcy court, as the trier of fact, had the opportunity to note 'variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.'" Anderson, 470 U.S. at 575. We thus defer to the bankruptcy court's reasonable assessment of Scafani's credibility. In addition, although the Schaefer Entities acknowledged the existence of the Urban Coast and SD Lofts debts each time they made a loan to Debtor, this acknowledgment does not show that such debts were valid. Frank Schaefer also testified that there was no note in connection with the $3,400,000 million Urban Coast obligation. In short, other than the subordination agreements regarding the UC DOT, there is no evidence in the record that refutes Scafani's or Schaefer's testimony.

Trustee also points to no evidence in the record - other than the subordination agreements - that establishes the SD Lofts debt. The bankruptcy court noted that McHaffie had signed the deed of trust on behalf of SD Lofts but there was no demand for payment on the underlying note between February 12, 2004 and November 24, 2004.

Simply put, Trustee's "mountain of evidence" is not in the record. Accordingly, the bankruptcy court committed no clear error by excluding the Urban Coast or SD Lofts debts when

-25-

calculating Debtors' liabilities during the Relevant Period.

### 3. The transfer of the deed of trust in connection with the April 2, 2004 Loan was not fraudulent.

Under Cal. Civ. Code § 3439.04(a)(2)(A), "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation [w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor . . . [w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction."

Trustee seeks to avoid as fraudulent transfers the deed of trust Debtors gave to Schaefer Construction in connection with the April 2, 2004 Loan and the later transfers of Tropicana to Schaefer and Lemire. Trustee contends that because the loan funds went to purchase Tropicana, the deed of trust given to Schaefer Construction was a "transfer" of Debtors' property for no consideration and thus was fraudulent. Trustee further asserts that "since proper recognition of the stipulated Urban Coast and SD Lofts debts establishes that Debtors were insolvent as of April 2, 2004, the granting of a deed of trust on the Lofts Property was without question a fraudulent transfer that should be avoided."

As previously discussed, the bankruptcy court did not err by omitting the Urban Coast and SD Lofts debts when determining Debtors' assets and liabilities at the time of the April 2, 2004 Loan. Therefore, as the bankruptcy court found, Debtors were balance sheet solvent on and after the April 2, 2004 Loan and

-26-

were not left with unreasonably small assets as a result. Because Trustee failed to prove an essential element of her fraudulent transfer claim related to the April 2, 2004 Loan, the claim fails and we need not resolve the other related elements, including whether reasonably equivalent value existed. Accordingly, there is no basis to reverse the bankruptcy court's judgment in favor of Schaefer Construction on this fraudulent transfer claim.

### 4. The bankruptcy court did not err by misapplying the burden of proof with respect to the fraudulent transfer liability of Lemire.

Cal. Civ. Code § 3439.08(a) states that "[a] transfer or an obligation is not voidable under subdivision (a) of [Cal. Civ. Code section] 3439.04, against a person who took in good faith and for a reasonably equivalent value. . . ." Thus, a showing of good faith and reasonably equivalent value is all that is required to defeat a creditor's action based on Cal. Civ. Code § 3439.04(a). Obviously, if a transfer is made both in good faith and for a reasonably equivalent value, then the transfer is not a fraudulent transfer under Cal. Civ. Code § 3439.04(b) either, since subdivision (b) applies only to transfers made without receipt of reasonably equivalent value. Cal. Civ. Code § 3439.08(b)(2) authorizes the creditor to obtain judgment against a subsequent transferee.

In its memorandum decision, the bankruptcy court found:

The Trustee's remaining fraudulent transfer claim against Lemire derives from her claim against the Schaefer Entities arising out of the Tropicana transaction. Specifically, the Trustee seeks to recover whatever profit Lemire gained from her sale of the Tropicana property.

-27-

As noted above, the Tropicana LLC interests or the underlying real property never belonged to the Debtors. Further, Lemire contributed value for the property. She paid $70,000 for an option to purchase it from Schaefer. She then borrowed funds to improve the property and reduced the vacancy rate through her own labors. Lemire sold the Tropicana real property for $5,750,000. But she could not state with certainty the amount she received from the transaction after accounting for payments to Schaefer and the liens against property. And the Trustee did not offer any evidence on the amount Lemire may have personally profited from the sale.

The court therefore finds that the Trustee has failed to meet her burden of showing that Lemire was a subsequent transferee of property of the Debtors or that she did not provide reasonably equivalent value. The court will enter judgment in Lemire's favor.

As discussed above, Trustee asserted Debtors' transfer of the deed of trust to Schaefer Construction was fraudulent. Schaefer Construction later assigned the April 2, 2004 note and deed of trust to Lemire on December 30, 2004. Therefore, Trustee contends that Lemire is a subsequent transferee who is liable, the same as Schaefer Construction, for the fraudulent transfer of the $1,200,000 trust deed. Trustee further argues that Lemire had the defense, if she could establish it, that she took the transfer for value and in good faith. Cal. Civ. Code § 3439.08(b)(2). Trustee asserts that the bankruptcy court improperly placed the burden on her, rather than Lemire, to prove value and good faith.

The bankruptcy court found that the deed of trust recorded on April 14, 2004, in connection with the April 2, 2004 Loan by Schaefer Construction, could not be avoided as a fraudulent transfer since Debtors were balance sheet solvent on and after the April 2, 2004 Loan and were not left with unreasonably small assets as a result. Thus, Trustee failed to prove an essential

-28-

element of her fraudulent transfer claim against Schaefer Construction. If Trustee could not avoid the transfer of the deed of trust as to Schaefer Construction on this ground, Trustee could not recover from Lemire as a subsequent transferee. It follows that there was no need for Lemire to prove that she took the transfer for value and in good faith when there was no fraudulent transfer in the first place. Accordingly, to the extent the bankruptcy court misapplied the burden of proof, it is harmless error.

**B.   Fraudulent Transfer - Halifax**

Trustee successfully avoided the fraudulent transfer of $1,100,000 from Debtors to Halifax as constructively fraudulent under Cal. Civ. Code § 3439.04(a)(2), which Halifax challenges on appeal. Under this section, there must be a transfer of property of the debtor; constructive fraud is defined simply as transactions in which the debtor receives less than reasonably equivalent value for this transfer at a time when the debtor is insolvent. Trustee bears the burden of proving all these elements.

In its memorandum decision, the bankruptcy court found that the $1,100,000 payment from Debtors to Halifax was constructively fraudulent and should be avoided: "The Halifax payment left the Debtors with [unreasonably small assets] and rendered them insolvent. Moreover, neither Halifax nor Scafani provided reasonably equivalent value for this transfer."

>   **1.   The lis pendens did not make Halifax a fully secured creditor.**

Halifax argues on appeal, as it did at trial, that it was

fully secured by virtue of recording the lis pendens. Thus, because it received payment from Debtors as a fully secured creditor, the transfer was not fraudulent under the holding in Henry v. First All. Mortg. Co. (In re First All. Mortg. Co.), 471 F.3d 977, 1008 (9th Cir. 2006)("'[r]epayments of fully secured obligations—where a transfer results in a dollar for dollar reduction in the debtor's liability—do not hinder, delay, or defraud creditors because the transfers do not put assets otherwise available in a bankruptcy distribution out of their reach.'").

Halifax offers no persuasive authority to support its argument that its notice of lis pendens operated as an "encumbrance" which made it a fully secured creditor. This is not surprising since, under California law, a notice of lis pendens does not make the person who recorded it a secured creditor. Cal-Western Reconveyance Corp. v. Reed, 152 Cal.App.4th 1308, 1318-19 (2007) (citing Campbell v. Super. Ct., 132 Cal.App.4th 904, 914 (2005) ("true purpose of the lis pendens statute is to provide notice of pending litigation and not to make plaintiffs secured creditors of defendants nor to provide plaintiffs with additional leverage for negotiating purposes.")); see also Cal. Code Civ. Proc. § 405.20 (lis pendens serves as notice that litigation regarding the property is being pursued).

Halifax's reliance on Hurst Concrete Products, Inc. v. Lane (In re Lane), 980 F.2d 601 (9th Cir. 1992) is misplaced. The facts in Lane are distinguishable. The issue in Lane was whether the filing of a lis pendens was a transfer within the

-30-

definition of transfer set forth in § 547(e)(1)(A). The question of whether the filing of a lis pendens creates a lien is missing from the court's analysis.

In sum, the filing of the lis pendens did not make Halifax fully secured. Therefore, the rule espoused in <u>In re First All. Mortg. Co.</u> has no applicability to this case. Accordingly, the bankruptcy court did not err on this basis.

**2.   The bankruptcy court did not err in determining that Halifax did not give reasonably equivalent value for payment of $1,100,000 by releasing its $1.6 million note, dismissing its lawsuit, and withdrawing the lis pendens against the Lofts Property.**

Under Cal. Civ. Code § 3439.04(a), a transfer is avoidable if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor intended to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due. <u>See also</u> Cal. Civ. Code § 3439.05.

With respect to the reasonably equivalent value requirement, the bankruptcy court found:

> In this case, McHaffie, Urban Coast, Halifax and Scafani executed the Halifax Sale Agreement. One component of this agreement required Urban Coast or McHaffie to pay $1,600,000 to Halifax. This secured McHaffie's acquisition of Urban Coast and through it, the UC Lofts Real Property. McHaffie and Urban Coast also owed brokerage rights and purchase options to John Scafani. The Debtors were not signatories to the Halifax Sale Agreement. That the UC Lofts Real Property secured those obligations did not transform them into the Debtors' liabilities. Nor is it apparent that the change in leadership from Scafani to McHaffie provided any value to the Debtors to support granting a security interest in their property. Thus, under the indirect benefit rule stated in Northern Merchandise and Pajaro Dunes, Defendants must demonstrate that Debtor's received a direct, tangible benefit from paying Urban Coast and McHaffie's obligation.

-31-

Defendants offered substantial testimony emphasizing that Scafani agreed to relinquish his purchase options and brokerage rights and that Halifax agreed to a $500,000 reduction on its note. But the testimony from Warner and Schaefer established that they believed the lis pendens was improperly recorded and could have been expunged for a fraction of the settlement price. The court accepts this characterization. Thus, the Debtors can hardly be said to have received reasonably equivalent value by paying $1,100,000 for its removal. Moreover, the upstream benefit Urban Coast and McHaffie received by being relieved from obligations under the Halifax Sale Agreement did not provide a sufficiently tangible benefit to the Debtors to allow the court to conclude they received reasonably equivalent value.

Halifax challenges these findings on appeal and argues that we should review these findings under a de novo standard of review rather than a clearly erroneous standard. In support of this contention, Halifax relies on Maddox v. Robertson (In re Prejean), 994 F.2d 706, 708 (9th Cir. 1993).

In Prejean, the Ninth Circuit considered whether California case law which held that the release of time-barred debt was consideration to avoid a fraudulent transfer was abrogated in light of California's recent adoption of the California Fraudulent Transfer Act (CFTA). The CFTA substituted the term "reasonably equivalent value" for "fair consideration." As noted by the Ninth Circuit, the facts in Prejean were undisputed. Id. at 707. Ursula Maddox lent her brother, Joseph Prejean, $40,000 between 1968 and 1971 to assist him in attending medical school. The two did not memorialize the loan in writing. Between 1974 and 1984, Maddox also cared for Prejean's child. Nothing was set down in writing during that period either to value those services or to establish terms of payment. Maddox and Prejean agreed in 1985 upon a figure of

$200,000 as representing the aggregate value of the child care services and the loan.  They did not record that figure in writing.  In September 1987, Prejean gave Maddox a $100,000 note that he secured with a deed of trust upon his home.  The deed was recorded in January 1988.

Seventeen months later Prejean filed a chapter 7 bankruptcy petition.  The trustee brought an action in the bankruptcy court to set aside the transfer of the interest in Prejean's home under § 544.  The trustee alleged that the transfer of the home violated the CFTA.  The primary issue was whether the satisfaction of a time-barred debt was "reasonably equivalent value" for a transfer, thus precluding the transfer from being avoidable under Cal. Civ. Code § 3439.04.

The bankruptcy court refused to set aside the transfer.  It found that the note and transfer had been made in good faith, and that finding was not challenged on appeal.  Citing United States Fid. & Guar. Co. v. Postel, 64 Cal.App.2d 567 (Cal. Ct. App. 1944), the bankruptcy court reasoned that the discharge of a moral obligation is "reasonable consideration" for a new promise to repay a time-barred debt.  In United States Fidelity, the California Court of Appeal determined that the payment of an antecedent debt that is partially time-barred is "fair consideration."  United States Fidelity had been decided under the California Fraudulent Conveyance Act, the predecessor of the CFTA.

The BAP reversed the judgment of the bankruptcy court. It held, among other things, that United States Fidelity was no longer good law.  Analogizing Cal. Civ. Code § 3439.04 to § 548,

-33-

the federal "strong-arm" statute that contains "reasonably equivalent value" language, the BAP said:

> The switch from 'fair consideration' to 'reasonably equivalent value' directs attention away from what is fair as between the parties and instead measures consideration in terms of its objective worth to all the transferor's creditors.

Maddox appealed. On appeal the Ninth Circuit couched the issues as legal ones requiring de novo review. The court first considered the question whether California's recent adoption of the UFTA, which substituted "reasonably equivalent value" for "fair consideration," implied a rejection of the rule set forth in United States Fidelity. The Ninth Circuit held that the Panel had read United States Fidelity too narrowly:

> We discern nothing in the language or history of the CFTA that would lead us to conclude that a time-barred debt that was a 'fair equivalent' from the viewpoint of the creditors under the prior law is not also 'reasonably equivalent value' under the CFTA. There has been no showing that the California legislature intended to abrogate the rule of United States Fidelity in enacting the current statute.

The Ninth Circuit noted that under both prior law and the CFTA reasonably equivalent value must be determined from the creditors' standpoint, not the debtor's.

The court observed that Prejean gave Maddox a security interest in satisfaction of an antecedent obligation, arising from cash loans and valuable services, that, but for the statute of limitations, was enforceable. Therefore, since United States Fidelity remained good law, the court concluded that the transfer satisfied the requirement of "reasonably equivalent value" contained in the CFTA and reversed the Panel's decision.

As this recitation shows, the issue before the Ninth

-34-

Circuit in Prejean was not a factual one where consideration for a transfer was to be weighed, but rather was a determination of whether a type of consideration — release of time-barred debt — was still to be considered of value after a change in California law. The Ninth Circuit appropriately applied de novo review to its determination of this legal issue. However, we are not persuaded that the Ninth Circuit held that a factual determination of reasonably equivalent value requires de novo review. See Ehrenberg v. Tenzer (In re Heartbeat of the City, N.W., Inc.), 2006 WL 6810939, at *5 (9th Cir. BAP April 6, 2006) (stating that there was no clear statement in the Ninth Circuit case law concerning whether determining if reasonably equivalent value has been given for a transfer for purposes of § 548 is a question of law).

Indeed, the Ninth Circuit later applied the clearly erroneous standard of review to the bankruptcy court's determination of reasonably equivalent value in Decker v. Tramiel (In re JTS Corp.), 617 F.3d 1102, 1109 (9th Cir. 2010). In JTS, after the district court reversed the bankruptcy court's determination that the defendant had paid reasonably equivalent value when purchasing real property, the Ninth Circuit found error in the District Court's ruling. It determined that the bankruptcy court's finding of reasonably equivalent value "was not clearly erroneous" since the evidence supported that conclusion, clearly applying this deferential standard of review

-35-

to the trial court's factual finding. Id. at 1109-10.[12]

Accordingly, because we are not convinced otherwise, we follow the clearly erroneous standard adopted in JTS and the weight of authority in other circuits and consider the issue a question of fact. In re Heartbeat of the City, 2006 WL 6810939, at *5 n.8 (noting that eight other circuits and a leading treatise consider the issue a question of fact).[13]

We now reach the merits of Halifax's various arguments. Halifax contends that the $1,100,000 payment it received matched more than a dollar for dollar benefit to Debtors. Halifax asserts that in addition to having the $1,600,00 lien against the Lofts Property extinguished, "they" obtained a discount of

---

[12] California case law is in accord. See Patterson v. Missler, 238 Cal.App.2d 759, 766-67 (Cal. Ct. App. 1966).

[13] Tex. Truck Ins. Agency v. Cure (In re Dunham), 110 F.3d 286, 288-89 (5th Cir. 1997) offered the following survey of circuit cases determining whether reasonable equivalency is a question of law, subject to de novo review, or a question of fact: Consove v. Cohen (In re Roco Corp.), 701 F.2d 978, 982 (1st Cir. 1983) (factual issue to be reviewed for clear error); Klein v. Tabatchnick & Emmer, 610 F.2d 1043, 1047 (2nd Cir. 1979) (fairness of consideration is generally a question of fact); Morrison v. Champion Credit Corp. (In re Dewey Barefoot), 952 F.2d 795, 800 (4th Cir. 1991)(factual determination that can only be set aside if clearly erroneous); Bundles v. Baker (In re Bundles), 856 F.2d 815, 825 (7th Cir. 1988)(great deference to the district court); Jacoway v. Anderson (In re Ozark Rest. Equip. Co., Inc.), 850 F.2d 342, 344 (8th Cir. 1988) (question of fact reversible only if clearly erroneous); Clark v. Sec. Pac. Bus. Credit, Inc. (In re Wes Dor, Inc.), 996 F.2d 237 (10th Cir. 1993)(suggesting fact question); and Nordberg v. Arab Banking Corp. (In re Chase & Sandborn Corp.), 904 F.2d 588, 593 (11th Cir. 1990)(fair consideration is largely a question of fact). The Dunham court noted that in the Ninth Circuit, according to Prejean, reasonable equivalency is subject to de novo review.

-36-

$500,000 on the lien, and the withdrawal of the lis pendens which allowed Debtors to resume development of the Lofts Property.

Halifax also maintains that the only defect in the lis pendens was that it was recorded against the property of a non-party. However, James Warner testified unequivocally that this minor defect could be corrected by amending the complaint to add Debtors as named defendants, an amendment which the trial judge would "never, never" deny. Halifax points out that Warner was the attorney of record for Debtors at the time of the Halifax Settlement Agreement and thus he was in a position to value the settlement and agreed that withdrawing the lis pendens and discounting the note constituted valuable consideration to Debtors.

Contrary to Halifax's assertion, we discern no error with the bankruptcy court's analysis. The reasonably equivalent value analysis "is directed at what the debtor surrendered and what the debtor received irrespective of what any third party may have gained or lost." Wyle v. C.H. Rider & Family (In re United Energy Corp.), 944 F.2d 589, 597 (9th Cir. 1991); see also Frontier Bank v. Brown (In re N. Merch., Inc.), 371 F.3d 1056, 1059 (9th Cir. 2004)(the "primary focus . . . is on the net effect of the transaction on the debtor's estate and the funds available to the unsecured creditors."); Roosevelt v. Ray (In re Roosevelt), 176 B.R. 200, 206 and 208 (9th Cir. BAP 1994) (same).

"Beyond looking at what is exchanged in a quid pro quo transaction, it is important to examine the value of all

benefits inuring to a debtor by virtue of the transaction in question, directly or indirectly." In re Fox Bean Co., Inc., 287 B.R. 270 (Bankr. D. Idaho 2002)(citing Pummill v. Greensfelder, Hemker & Gale (In re Richards & Conover Steel, Co.), 267 B.R. 602, 612-13 (8th Cir. BAP 2001); see also In re N. Merch., Inc., 371 F.3d at 1058 ("It is well settled that reasonably equivalent value can come from one other than the recipient of the payments, a rule which has become known as the indirect benefit rule."). "Under [the indirect benefit rule], some clear and tangible benefit to the debtor must still consequently result from the payment by the transferee." Pajaro Dunes Rental Agency, Inc. v. Spitters (In re Pajaro Dunes Rental Agency, Inc.), 174 B.R. 557, 579 (Bankr. N.D. Cal. 1994).

There is a two step process required to determine whether a debtor received a reasonably equivalent value. Greenspan v. Orrick (In re Brobeck, Phleger, & Harrison, LLP, 408 B.R. 318, 341 (Bankr. N.D. Cal. 2009). First, it must be determined that the debtor received value. Id. Value is defined under Cal. Civ. Code § 3439.03 as follows:

> Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.

Value is similarly defined for purposes of § 548. Id. (citing In re United Energy Corp., 944 F.2d at 595). Second, the court must determine whether that value was reasonably equivalent to what the debtor gave up. Id. Reasonable equivalence can include the elimination of claims or litigation. In re United

-38-

Energy, 944 F.2d at 595-96. Finally, the determination of reasonable equivalence must be made as of the time of the transfer. BFP v. Resolution Trust Corp., 511 U.S. 531, 546 (1994). Trustee had the burden of showing that Debtors did not receive reasonably equivalent value in exchange. In re Pajaro Dunes Rental Agency, Inc., 174 B.R. at 578.

Here, the bankruptcy court considered what Debtors received and what they gave up when determining whether there was reasonably equivalent value. As noted by the bankruptcy court, Debtors were not obligated on the underlying note. Therefore, reducing the amount owed on the note by $500,000 cannot be said to have benefitted Debtors directly or indirectly. Generally speaking, a debtor's payment of the debt of another does not constitute a reasonably equivalent value when the debtor is not obligated on the debt. Wood v. Delury, Pomares & Co. (In re Fair Oaks, Ltd.), 168 B.R. 397, 402 (9th Cir. BAP 1994).

Further, while the $1,100,000 payment to Halifax satisfied the lien against the Lofts Property, the bankruptcy court found that Debtors had received no value in connection with the transfer of the deed of trust in the first place; i.e., they were not obligated on the loan. Additionally, the court found no indirect benefit to Debtors since the transfer in leadership from Scafani to McHaffie did not provide any value for the security obligation. Halifax does not point to any evidence in the record that would contradict the bankruptcy court's finding of no value.

Further, although Debtors transferred $1,100,000 to Halifax in settlement of the litigation, Debtors were not named as

defendants in the litigation. It follows that none of the claims were asserted against them. Nor is it apparent from the record that Debtors' future was dependent upon the resolution of the lawsuit rather than on the withdrawal of the lis pendens. Although the withdrawal of the lis pendens was beneficial to Debtors so they could resume development, the bankruptcy court quantified that benefit as being worth at most $10,000. Thus, Debtors payment of $1,100,000 to Halifax for that benefit cannot be reasonably equivalent. See BFP, 511 U.S. at 540 n.4 (". . . the phrase 'reasonably equivalent' means 'approximately equivalent,' or 'roughly equivalent.'"). Accordingly, the bankruptcy court properly found that Debtors did not receive reasonably equivalent value for the $1,100,000 payment and that finding was not clearly erroneous.

**3. The bankruptcy court did not err in determining that John Scafani was not liable for receiving a fraudulent transfer because the entire $1,100,000 transfer went to Halifax's creditors and Scafani did not receive any of the funds.**

Scafani's unrebutted testimony was that the $1,100,000 payment from Debtors to Halifax went to Halifax's creditors. Trustee did not trace the funds nor has she pointed out any evidence in the record showing otherwise. See In re Pajaro Dunes Rental Agency, Inc., 174 B.R. at 583 ("Tracing of funds has often been a part of fraudulent transfer litigation."). Accordingly, the bankruptcy court's finding that Scafani did not receive any of the $1,100,000 from Debtors was supported by inferences drawn from the facts in the record. We thus discern no error.

-40-

## C. Aiding and abetting breach of fiduciary duty: Schaefer Entities

In connection with Trustee's claim against the Schaefer Entities for aiding and abetting McHaffie's breach of fiduciary duty, the bankruptcy court found:

> Under California law, "[l]iability may ... be imposed on one who aids and abets the commission of an intentional tort if the person ... knows the other's conduct constitutes a breach of a duty and gives substantial assistance or encouragement to the other to so act.'" In re First All. Mortg Co., 471 F.3d at 993 (quoting Casey v. U.S. Bank Nat'l Assn., 127 Cal.App. 4th 1138, 1144 (2005)); see also Fiol v. Doellstedt, 50 Cal.App. 4th 1318, 1325-26 (1996). "[A]iding and abetting liability ... requires a finding of actual knowledge, not specific intent." In re First All. Mortg. Co., 471 F.3d at 993.
>
> In First Alliance Mortgage, a jury found Lehman Brothers, Inc. and its subsidiary ("Lehman") liable for aiding and abetting the debtor's fraudulent lending practices. Id. at 983. The finding relied on Lehman's eventual relationship as the debtor's only lender, its intimate knowledge of the debtor's lending practices and its substantial assistance in furthering the scheme by continuing to lend. Id. at 986-87, 994-95. In fact, Lehman warned the debtor that if it did "not change its business practices, it [would] not survive scrutiny." Id. at 994.
>
> Here, the Schaefer Entitles, like Lehman, at some point became the Debtors' only source of financing such that they provided substantial assistance. Further, it is apparent that Schaefer at least had the opportunity to scrutinize each disbursement from the fund controls. But distinct from the situation in First Alliance, Schaefer credibly testified that his primary, if not sole, focus was the equity in the property—not the Debtors' progress on the Atmosphere Project. Moreover, the Fund Control Agreement gave him the contractual right to presume that each disbursement request was actually what the borrower requested and related to the project. Finally, the proposed budget negotiated between the Schaefer Entities and McHaffie contemplated management and contingency line items, for which they allotted over $400,000.
>
> Thus, the court cannot conclude that the Schaefer Entities had actual knowledge of McHaffie's

-41-

defalcations as they occurred. The Trustee has therefore failed to meet her burden on this claim, and judgment for the Schaefer Entities is appropriate.

Trustee argues that the bankruptcy court's finding that the Schaefer Entities did not have actual knowledge of McHaffie's defalcations as they occurred was clear error. According to Trustee, the court's conclusion ignores "substantial amounts of uncontroverted evidence and the court's own findings." Specifically, the court found that "the Schaefer Entities possessed a significant degree of control over the Debtors" and "Schaefer had the opportunity to scrutinize each disbursement from the fund controls." These findings, Trustee argues, show that Schaefer could not have been unaware that $570,000 or more taken out of the First Fund Control account was misdirected towards Tropicana. Trustee also asserts that the Fund Control Agreement does not allow the Schaefer Entities to avoid liability. The agreement provides:

Control shall conclusively presume that any written order of an authorized person is (1) given for the purposes stated in the order; and (2) authorized by the owner and contractor.

Because Schaefer failed to produce any written order for the misdirected payments, Trustee argues that he may not rely upon any presumption that these payments were intended for completion of the Atmosphere Project.

We disagree that this constitutes error. The bankruptcy court's finding that the Schaefer Entities had no actual knowledge of McHaffie's breach of fiduciary duty is plausible in light of the evidence presented. Although the court found that the Schaefer Entities exercised a significant degree of control

-42-

over Debtors and that they had the opportunity to scrutinize each disbursement from the fund control accounts, the bankruptcy court also relied on Schaefer's testimony in making its ruling. Schaefer testified that his primary focus was on the equity in the Lofts Property and not Debtors' progress on the completion of the Atmosphere Project. Thus, even if Schaefer was aware that McHaffie was not using the April 2, 2004 loan proceeds for the development of the Lofts Property, a reasonable inference from his testimony is that he did not make a conscious choice to make loans to Debtors knowing that McHaffie was engaging in improper conduct. See Lomita Land & Water Co. v. Robinson, 154 Cal. 36, 47 (1908) (The defendant must have acted to aid the primary tortfeasor "with knowledge of the object to be attained."). Moreover, "[m]ere knowledge that a tort is being committed and the failure to prevent it does not constitute aiding and abetting." Fiol v. Doellstedt, 50 Cal.App.4th 1318, 1326 (1996).

In short, the bankruptcy court was free to accept Schaefer's testimony and draw any reasonable inferences therefrom to support its ruling. It is not the province of the appellate court to reweigh the evidence and choose between competing inferences. See Anderson, 470 U.S. at 573-74 ("[i]f the [trial] court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently"). Despite Trustee's argument to the contrary, we see nothing that requires a difference result.

-43-

**D.    Preferential Transfer Claim: Schaefer's Insider Status**

Section 547(b) authorizes a trustee to avoid preferential transfers made by a debtor within certain periods of time before the bankruptcy filing. Miller v. Schuman (In re Schuman), 81 B.R. 583, 585 (9th Cir. BAP 1987). Where a creditor is an insider, the preference period is one year. Id.

Trustee seeks to recover a $506,000 payment on the Second Loan to Schaefer Construction within one year of the commencement of the bankruptcy case. The trustee bears the burden of proof to establish each and every element under § 547(b) in order to avoid a transfer as a preference. Batlan v. TransAmerica Commercial Fin. Corp. (In re Smith's Home Furnishings, Inc.), 265 F.3d 959, 963 (9th Cir. 2001).

The bankruptcy court found:

The court accepts Schaefer's testimony as credible in all respects and finds that neither he nor Frank Schaefer Construction, Inc. nor Frank Schaefer Construction, Inc. Pension Plan was an insider of the Debtors. The Schaefer Entities exerted considerable control over Debtors and McHaffie. But this control never extended beyond that of a secured lender-to-borrower relationship.

Significantly, the court notes that Schaefer faithfully acted according to the terms of the various promissory notes and deeds of trust. He also never refused a disbursement request from McHaffie. And with the exception of the Halifax payment, Schaefer did not advocate that the Debtors pay certain creditors or forego payments to others. Ultimately, the evidence did not establish that Schaefer was ever able to pressure Debtors in such a way as to substitute his own decision making power for McHaffie's.

Trustee challenges these findings, contending that the bankruptcy court applied the wrong legal test for determining non-statutory insider status. According to Trustee, there are

-44-

different legal standards applied when considering statutory insiders under § 101(31) and non-statutory insiders. While the "person in control" test may apply to statutory insiders, Trustee argues that with non-statutory insiders actual control is not required: "it is not necessary that a non-statutory insider have actual control; rather the question is whether there is a close relationship [between debtor and creditor] and . . . anything other than closeness to suggest that any transactions were not conducted at arm's length." See Shubert v. Lucent Techs. Inc. (In re Winstar Comm'ns, Inc.), 554 F.3d 382, 396-97 (3d Cir. 2009).

First of all, we are not bound by Third Circuit case law, but by Ninth Circuit case law and our own prior decisions. See State v. Rowley (In re Rowley), 208 B.R. 942, 944 (9th Cir. BAP 1997) (stating that we are bound by prior Panel decisions). Second, our reading of the relevant legal authorities indicates that the bankruptcy court did not apply the wrong legal test as demonstrated below.

The Bankruptcy Code provides a definition of insider that varies based on the type of debtor and includes different individuals who are insiders depending on whether the debtor is a person, corporation, partnership, or municipality. § 101(31).[14] However, "the respective insider definitions do not

[14] Section (31) provides in relevant part:
The term "insider" includes--
    (A) if the debtor is an individual--
    (i) relative of the debtor or of a general partner of
    the debtor;

(continued...)

-45-

attempt or purport to be all inclusive." In re Friedman, 126 B.R. at 69. An insider can either fall into one of these per se classifications listed in the statute, or be a non-statutory insider who has a "professional or business relationship with the debtor . . . where such relationship compels the conclusion that the individual or entity has a relationship with the debtor, close enough to gain an advantage attributable simply to affinity rather than to the course of business dealings between the parties." Id. at 70. A non-statutory insider is one "who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms [sic] length with the

---

[14] (...continued)
(ii) partnership in which the debtor is a general partner;
(iii) general partner of the debtor; or
(iv) corporation of which the debtor is a director, officer, or person in control;
(B) if the debtor is a corporation--
(i) director of the debtor;
(ii) officer of the debtor;
(iii) person in control of the debtor;
(iv) partnership in which the debtor is a general partner;
(v) general partner of the debtor; or
(vi) relative of a general partner, director, officer, or person in control of the debtor;
(C) if the debtor is a partnership--
(i) general partner in the debtor;
(ii) relative of a general partner in, general partner of, or person in control of the debtor;
(iii) partnership in which the debtor is a general partner;
(iv) general partner of the debtor; or
(v) person in control of the debtor;

. . . .

-46-

debtor." Vill. at Lakeridge, LLC v. United States Bank N.A. (In re Vill. at Lakeridge, LLC), 2013 WL 1397447, at *5 (9th Cir. BAP Apr. 5, 2013) (citing In re Friedman, 126 B.R. at 70); see also Miller Ave. Prof'l & Promotional Servs. v. Brady (In re Enter. Acquisition Partners, Inc.), 319 B.R. 626, 631 (9th Cir. BAP 2004) (citing Wilson v. Huffman, 712 F.2d 206, 210 (5th Cir. 1983)).

In determining whether a creditor qualifies as a non-statutory insider, courts look at "the closeness of the parties and the degree to which the transferee is able to exert control or influence over the debtor." In re Vill. at Lakeridge, LLC, 2013 WL 1397447, at *5 (citing In re Enter. Acquisition Partners, Inc., 319 B.R. at 626 and Miller v. Schuman (In re Schuman), 81 B.R. 583, 586 (9th Cir. BAP 1987)). The primary test of a non-statutory insider is whether the creditor "exercises such control or influence over the debtor as to render their transaction not arms-length." Id.

Here, the bankruptcy court implicitly applied the legal test for determining whether the Schaefer Entities were non-statutory insiders espoused in our precedent. The court determined that there was "closeness" because the Schaefer Entities exerted considerable control over Debtors. However, the bankruptcy court quantified that control by stating that it never extended beyond a secured lender to borrower relationship. In addition, the court implicitly found no other evidence to suggest the transactions were not conducted at arm's length: (1) Schaefer faithfully acted according to the terms of the various promissory notes and deeds of trust; (2) Schaefer never

-47-

refused a disbursement request from McHaffie; and (3) with the exception of the Halifax payment, Schaefer did not advocate that the Debtors pay certain creditors or forego payments to others. Again, the bankruptcy court's findings came down to Schaefer's credibility: "[w]hen factual findings are based on determinations regarding the credibility of witnesses, we give great deference to the bankruptcy court's findings . . . ." Anderson, 470 U.S. at 575. Accordingly, we discern no error in the bankruptcy court's decision that the Schaefer Entities were not insiders for purposes of § 547.

**E.  Equitable subordination of Schaefer Construction's proof of claim**

"The subordination of claims based on equitable considerations generally requires three findings: '(1) that the claimant engaged in some type of inequitable conduct, (2) that the misconduct injured creditors or conferred unfair advantage on the claimant, and (3) that subordination would not be inconsistent with the Bankruptcy Code.'"  In re First All. Mortg. Co., 471 F.3d at 1006.  "Where non-insider, non-fiduciary claims are involved, as is the case here, the level of pleading and proof is elevated: gross and egregious conduct will be required before a court will equitably subordinate a claim." Id.  "Although equitable subordination can apply to an ordinary creditor, the circumstances are 'few and far between.'"  Id.

Here, the bankruptcy court found no inequitable conduct. The Schaefer Entities were not insiders and the relationship between Debtors and the Schaefer Entities never extended beyond those of a borrower-lender relationship.  Furthermore, because

-48-

the Halifax payment was not an obligation of the Schaefer Entities, Trustee did not show how their conduct depleted or otherwise adversely impacted Debtors' assets.  Trustee points to no evidence in the record which the bankruptcy court allegedly overlooked which would demonstrate an abuse of discretion. Accordingly, there is no basis for reversal on this assignment of error.

## VI.  CONCLUSION

For the reasons stated above, we AFFIRM the judgment in all respects.